WILLIAM H. HARRISON, appellant,

v.

JOSHUA S. COOLEY, respondent.

*Mr. William B. Guild,* for appellant.

*Mr. Joseph Coult,* for respondent.

On appeal from a decree of the chancellor based on the following opinion of Henry C. Pitney, esq., advisory master:

This bill is filed by a judgment creditor of the firm of Hall & Harrison, composed of Albert F. Hall and Reuben M. Harrison, in aid of an execution levied on goods and chattels once confessedly owned by the execution debtors, but now claimed by William H. Harrison, brother of R. M. Harrison, under two bills of sale, one from Hall to R. M. Harrison, and the other from R. M. Harrison to W. H. Harrison.

The question is as to the validity of the title of W. H. Harrison as against the creditors of the firm, particularly the complainant.

The complainant contends that the sale from the firm to William H. Harrison was fraudulent and void as against him and other creditors in his situation. The defendants deny the fraud, and put themselves upon the *bona fides* of the transaction, which s the sole question litigated.

At the close of the argument, I expressed a decided opinion that the conveyance from Hall to R. M. Harrison and from R. M. Harrison to W. H. Harrison was a bald and transparent fraud as against Hall, and would be set aside if complained of by him. At the same time, I felt grave doubt as to whether the complainant could take advantage of it, and took further time to consider, which having done, and after going over the whole case carefully, have now to state my conclusion.

The property conveyed included all the property of the partners, and, as now alleged, all debts due them. Neither has any

Harrison v. Cooley.

other property of any kind. Its conveyance to W. H. Harrison leaves them without means to discharge their indebtedness to complainant except an uncertain and remote interest in a stock company, which I stop here to say amounts to nothing.

As to the value of the property conveyed, Hall made up a statement of the affairs of the partnership on three separate papers. The first paper was a list of machinery and stock on hand—not produced. The amount appearing clearly from other papers is $2,475.98. (From this paper the list of articles sold in the bill of sale was taken. It was in the handwriting of Provost, who was W. H. Harrison's attorney, and, as is said, cannot be found). This amount was made up of original machinery purchased by this firm and other articles added.

Second paper, *Exhibit No. 1*, contains statements of accounts due, but the addition, $293.59, is erroneous, and has misled defendants and their counsel.

| | | |
|---|---:|---:|
| The gross amount of accounts due is...... ..... ...... | | $488 90 |
| Small items not on last paper......... ......... ......... | | 6 24 |
| | | $2,971 12 |
| From this amount allowances were made, as testified by Hall, and shown by figures on back of *Exhibit No. 2*, as follows: Difference in value of machinery (items of this are on back of *Exhibit 2*)...... ...... ......... | $64 00 | |
| Bad accounts (this shows also on back of *No. 2*), | 74 16 | |
| Difference in Churchill work (items also on back of *No. 2*)......... ......... ...... ......... | 80 05 | |
| Vise...... ...... ......... ............ ...... ......... | 4 00 | 222 21 |
| | | $2,748 91 |
| Amount after deductions......... ...... ......... | | 2,748 91 |
| Then was added (for what does not appear), | | 50 00 |
| | | $2,798 91 |
| Then was deducted (for what does not appear), | | 250 00 |
| | | $2,548 91 |

From all the evidence, I think this a fair valuation of the goods and accounts as a going concern.

The third paper, *Exhibit No. 2*, shows the debts.

| | | |
|---|---:|---:|
| Their total is........ ....... ...... ............. ..... ........ | $1,291 | 16 |
| (Not including the debt of the complainant), adding | | |
| complainant's debt......... ...... ...... ..... ........ | 930 | 00 |
| Total debts are......... ...... ...... ..... ....... ...... ........ | $2,221 | 16 |
| Assets ......... ......... ...... ...... ...... .......... ...... ......... | 2,548 | 91 |
| Balance of assets..... ...... ......... .............. ........ | $327 | 75 |

The firm was in that condition which may be considered insolvent for purposes of equity; that is, unable to pay their debts if called upon suddenly—unable to meet their obligations, except by the grace of creditors—but not insolvent in the sense of not being worth enough to pay their debts.

| | | |
|---|---:|---:|
| This indebtedness consisted of chattel mortgage and | | |
| rent to Hall's estate......... ......... ......... ............ | $695 | 86 |
| Open accounts..... ...... ......... ...... ............ .......... | 416 | 30 |
| Tucker, cash loaned...... ......... .......... ......... ........ | 150 | 00 |
| Unknown ......... ...... ...... ...... .......... ........ ........ | 29 | 00 |
| Total, except complainant's......... ......... ...... ........ | $1,291 | 16 |
| Complainant's......... ......... ......... ........ ...... ...... | 930 | 00 |
| In all......... ......... ......... ...... ......... ...... ...... | $2,221 | 16 |

### CIRCUMSTANCES OF THE CONVEYANCE.

Hall, desiring to sell out, spoke to W. H. Harrison to take his place in the firm, in the last of January or first of February, 1880. W. H. Harrison asked for statements, and those above referred to were made out. The complainant's debt was not on the statements. Then there was a consul-

tation between the three, and a brother, Charles Harrison, who was to furnish the money to W. H. Harrison. Hall asked $1,200 for his interest in the business, W. H. Harrison to pay all the debts except complainant's; that is, $600 for his half. W. H. Harrison declined, and then further negotiations were carried on through R. M. Harrison. Hall testifies that R. M. Harrison told him that W. H. Harrison would pay $300, or $150 each, and assume complainant's debt—$900—which was in effect the same as Hall had offered. Hall accepted, and the papers were to be made out. This was done by W. H. Harrison's orders, and two deeds were prepared, one from Hall to R. M. Harrison, and one from R. M. Harrison to W. H. Harrison. The first was dated February 12th, the other February 20th. Both were written at once, and in the same handwriting. The consideration of one $150, the other $1,600. The parties met at the shop; $120 were paid by W. H. Harrison to Hall ($30 retained to pay a workman), and Hall executed a bill of sale. This he understood to be a part of the sale from the firm to W. H. Harrison.

The three Harrisons then went to McCarter & Keen's office, and there R. M. Harrison executed the second bill of sale to W. H. Harrison. The consideration was as follows, as testified to by Hennion :

| | | |
|---|---:|---:|
| Debt of Hall's estate (chattel mortgage and rent)...... | $730 | 00 |
| Old note of R. M. Harrison......... ......... ...... ...... | 659 | 00 |
| Due-bill from W. H. Harrison......... ......... ......... | 211 | 00 |
| | $1,600 | 00 |

R. M. Harrison and W. H. Harrison swore that, the same evening after arriving home, the latter paid the former $120, and gave a new due-bill for $91. There is no other proof of this. It is contradicted by R. M. Harrison's admission to the complainant, and I am not satisfied it was paid.

R. M. Harrison continued in actual possession.

The fraud on Hall is palpable ; the juggle of the two bills of

Harrison *v.* Cooley.

sale and different considerations, show this. The contract between him and R. M. Harrison was that all debts, including the complainant's, were assumed by W. H. Harrison. This is confirmed by R. M. Harrison's affidavit, as follows:

| | | |
|---|---:|---:|
| Debt to estate of Hall.......................................... | $700 | 00 |
| Other debts.................................................. | 400 | 00 |
| Complainant's............................................... | 600 | 00 |
| | $1,700 | 00 |
| Cash....................................................... | 300 | 00 |
| Value of property........................................... | $2,000 | 00 |

The sale to W. H. Harrison was on a different consideration—leaving out the complainant's debt and paying R. M. Harrison with an old note, which W. H. Harrison declared under oath, on the stand, he considered worthless. Further, R. M. Harrison and W. H. Harrison say, by their answer, and swear on the stand, that book accounts were assigned as follows:

| | | |
|---|---:|---:|
| Amount of accounts due to firm.......................... | $293 | 59 |
| Book accounts due from the firm......................... | 398 | 31 |
| Difference ............................................ | $104 | 72 |

Say $105, and that this balance of $105, added to $1,600, makes the amount actually paid $1,705.

After the sale, Hall refused to turn over the books of account, and then R. M. Harrison released W. H. Harrison from his obligation to pay the debts of $398.51, and took his note for $105.

This, I am satisfied, was all a sham, and an after-thought got up to show a greater consideration for the goods sold, and is a confession that the consideration of $1,600 is inadequate.

The lack of good faith is shown by an examination of *Exhibits 1* and *2*, from which the figures 398.31 and 293.59 are

taken.    Both are pencil footings—one of accounts due the firm, the other of debts due by the firm—and both are incomplete.

| | | |
|---|---|---|
| The accounts due the firm are............. .......... ......... | $293 | 59 |
| Items not carried out, but written....... ...... ............... | 195 | 31 |
| | $488 | 90 |

Debts on *Exhibit 2*, not included in Hall's estate :

| | | |
|---|---|---|
| Open accounts.......... ...... ...... ...... ..........…......... ...... | 416 | 30 |
| To which add in pencil........ ...... .................. | 150 | 00 |
| | 29 | 00 |

The transactions were understood by Hall, and rightly, too,. to be .a unit.   R. M. Harrison introduces into it an element unknown to Hall, by which he receives back his old note as part of the consideration.

To take the edge off of this surrender of the old note as part consideration, W. H. Harrison and R. M. Harrison both swear that the old note was worthless.   Avoiding Scylla they run into Charybdis, and show no adequate consideration.

W. H. Harrison swears he did not know of the complainant's debt.

R. M. Harrison swears to the same thing.  .

All Hall can state is that R. M. Harrison assured him that W. H. Harrison was to pay it.   I can place no credence in the story of R. M. Harrison and W. H. Harrison.   Contradiction between affidavits and answer and evidence—their manner on the stand—compels me to disbelieve them.

The figures on the back of *Exhibit No. 2*, are significant. These figures are in pencil, but not in Hall's handwriting :

2600
900
───
1700

The attention of counsel was called to them during the trial, but no explanation was offered.   These papers were confessedly

in W. H. Harrison's possession all the time, the affidavits and answers were prepared from them, and they were produced by his counsel.

Hall did not have the benefit of their inspection when sworn; they were produced afterwards.

If there was any evidence that W. H. Harrison knew of complainant's debts, his denial would not satisfy me.

True, he says he considered the firm insolvent, and yet in buying their property he assumed all debts, and found margin for an old note of one of them for $700.

On the accounts as he made them up there was a handsome margin due R. M. Harrison. This indicates very strongly that he did suppose there were other debts. Else how were they insolvent?

But there is no evidence at all that he knew of it, except R. M. Harrison's statement to Hall.

The question is, then, *Was this transaction one which was void as to creditors at large?*

There was no written assumption by W. H. Harrison of any debt, except the mortgage debt, and no proof of it available to creditors, except R. M. Harrison's evidence. Hennion's evidence is insufficient.

W. H. Harrison could produce the bill of sale against any creditor and show how he paid the $1,600, as sworn to by Hennion, which included no debts except Hall's estate debt of $700.

Now, the value of the property altogether was $2,000; the equity conveyed not less than $1,300, for which W. H. Harrison paid only $150 in cash. This consideration I hold entirely inadequate. It does not amount to a *good* consideration. There must be a *bona fide sale* and a *good consideration,* both. *Sayre* v. *Fredericks, 1 C. E. Gr. 209; 1 Story's Eq. Jur. 353.*

It is very clear that R. M. Harrison intended to set creditors at defiance. His story that he had arranged to pay complainant with stock, is absurd and hurts his case.

The taking of his old note did not help him any. His brother was not pressing him, but complainant had a note just coming due which they could not meet. They killed several birds with

one stone.  He got clear of Hall, put the property in his brother's hands, where it would be just as valuable to him as in his own, and got it beyond the reach of the complainant.

It is hard to believe that W. H. Harrison did not participate in this scheme in all its length.  He did participate so far as cheating Hall went.  He now says he expected to pay all the debts, and did not know of complainant's debt.

I do not believe he meant to pay the unsecured debts on Hall's list, *No. 2.*

But whether he participated in the scheme to delay creditors, or not, the circumstances are such as to put him on his guard and bring him within the rule laid down in *Atwood* v. *Impson,* *5 C. E. Gr. 150.*

He bought the goods—all the property—of a firm which he admits he knew to be practically insolvent, at a grossly inadequate price.

The payment in part by the individual partner's note for the whole assets of the shaky firm, was in itself a fraud on creditors, as I understand the rule laid down in *Metropolitan Bank* v. *Sprague,* by the chancellor and court of errors.

Chancellor Zabriskie says, (*5 C. E. Gr. 30*):

"A payment of individual debts out of partnership assets will not be set aside unless in case of insolvency, or when done in contemplation of insolvency, to give an improper preference."

He held the preference in that case good.  The court of appeals thought he went too far in favor of such a transaction, and say, (*6 C. E. Gr. 544*):

"To exclude any presumption that the validity of that appropriation of the partnership funds is assented to, it may be well to say that in *Kirby* v. *Schoonmaker,* *3 Barb. Ch. 47,* Chancellor Walworth held the contrary doctrine, and based it upon what seems to be sound reason."

Here the favoring of the individual creditor was done by that individual member of the firm without the knowledge of the other partner, and in the face of the agreement of the other part-

ner, that all debts should be assumed—that is, R. M. Harrison agreed with Hall that the sale was on condition that all debts were assumed, and that he, R. M. Harrison, got the same as Hall. Instead of so carrying it out, he leaves complainant's debt out of the list assumed, and thereby leaves room for getting in his own individual debt. Such a sale Hall did not assent to, and W. H. Harrison knew that Hall did not assent to it.

Hall had a right to repudiate it, because he was left liable to pay this debt of the complainant, and as permitting assets to be disposed of for the benefit of the individual partner without his assent.

Such an equity in Hall, according to Chancellor Walworth, can be taken advantage of by their creditors. There are other authorities to the same effect.

I have examined the cases cited by defendant's counsel, and none go far enough to sustain this case. They all except the class of cases in which I think this is included. See, also, *Wilson* v. *Robertson, 21 N. Y. 587, 592.*

The case may be thus summarized:

Albert F. Hall made this bill of sale in good faith, upon the understanding that it was a part of a step in a sale by the two partners to W. H. Harrison at $300, over and above all debts, which were to be assumed by him. In point of fact, the sale was not made on such terms as the defendants now contend, but on terms which not only did not assume all debts, but was for an inadequate consideration and included the payment of an individual partner's debt out of partnership assets, leaving the firm insolvent.

The actual arrangement was made for the purpose, on the part of the other partner, R. M. Harrison, of delaying and putting off his creditors, and if W. H. Harrison did not participate in it, he had notice of facts sufficient to put him on inquiry.

I think the complainant is entitled to relief.

PER CURIAM.

This decree unanimously affirmed.